### HENDRICKSEN v. HUGH ROBERTS & SON et al.

District Court, S. D. New York.

Aug. 18, 1947.

---

Max Lustig, of New York City, for libelant.

Kirlin, Campbell, Hickox & Keating, of New York City (Vernon S. Jones, of New York City, of counsel), for British Ministry of War Transport and Hugh Roberts & Son.

E. C. Sherwood, of New York City (Royce Wilson, of New York City, of counsel), for Carter & Weekes Stevedoring Co.

KENNEDY, District Judge.

Originally libelant sued the British Ministry of War Transport to recover damages for personal injuries, sustained by libelant, as he was descending a swimming (pilot) ladder rigged over the side of S. S. Empire Wycliff. The British Ministry of War Transport admitted in its answer that it owned and operated the steamer, but, among other things, it asserted affirmatively that it enjoyed sovereign immunity. At the opening of the trial it developed that there was a disposition on the part of the British Ministry to eliminate the claim of sovereign immunity, and to give the libelant his day in court by substituting a suable respondent. Long after the completion of the taking of evidence, the respondent Hugh Roberts & Son was, in fact, substituted for the British Ministry of War Transport with the consent of the libelant, but not that of the impleaded respondent stevedore. The latter consented to nothing, because it had insisted from the very beginning of the trial that, technically, the Carter & Weekes Stevedoring Company did not belong in the suit, for the reason that the longshore work on Empire Wycliff had actually been performed by a subsidiary or affiliate corporation. I turn to the facts.

On September 21, 1944, libelant was the bargee in charge of Seaboard No. 58, which was then moored at Pier 7, North River, alongside Empire Wycliff; the scow was under hatch No. 2, engaged in taking on ballast discharged by the steamer. A ladder about 40 feet in length had been rigged from the deck of the steamer to the deck of the barge. This ladder is variously characterized in the record, sometimes as a Jacob's ladder, but it did not truly answer that description. It was made up of a series of wooden treads through which rope shrouds were rove, the treads being kept horizontal by triangular pieces of wood seized into the shrouds at each end of the tread. The top of the ladder was properly secured on board the steamer, being lashed to the stanchion inside the bulkhead. The bottom of the ladder, of course, swung free. It is the claim of the libelant that, while returning to his barge at about 8:00 P.M. on September 21, 1944, he was caused to fall from the ship's deck to the deck of his own barge because the ladder was defective, and, also, because the ship's deck was improperly lighted in the area where the ladder was secured. On both of these points there was a sharp conflict of evidence.

To take first the condition of the ladder, libelant and his witnesses asserted that the treads were not horizontal but at a sharp angle. There was lack of agreement among these witnesses as to the extent of the angle. (I am not, of course, thinking of

mathematical niceties.) Thus one of libelant's witnesses described the treads as being practically flat up against each other, somewhat resembling the position of the slats in a venetian blind when it is almost closed. Yet libelant himself, and his main witness, had no choice except to admit that each had ascended that same ladder a few hours before the accident. The ship's people and the longshore gang working at the No. 2 hatch all swore, on the other hand, that the ladder was in perfect condition. In fact, it was unequivocally stated by one of the ship's officers (a reliable witness) that the ladder had been purchased new at Leith (the ship's port of departure for the United States on the particular voyage), and had been used before September 21st only to embark the pilot upon entering New York harbor. I see no escape from the conclusion that the ladder was in good condition, particularly in the light of the undeniable fact that several people went to the rescue of the libelant just after he fell, and all of them safely used that same ladder both for descent and ascent, a manifest impossibility if the ladder looked even remotely like a closed venetian blind.

Concerning the claim of the libelant that the deck area near the ladder was improperly lighted, the situation is much the same. Vague claims were made by libelant, and by some of his witnesses that the lighting was poor. But I am compelled to find on the record as a whole that, on the evening in question, in the vicinity of No. 2 hatch there were one and possibly two lights on the mast, a light at the rail near the head of the ladder and shining down on the scow, and, of course, cargo lights rigged over the hatch itself. Beyond doubt, one of the longshoremen was actually working on the barge both before and after the accident occurred, and, if the lighting conditions were as described by libelant and his witnesses, this would have been impossible.

Respondent shipowner went further, in accounting for the accident, than merely to prove that the ladder was sound and the lights properly rigged and properly functioning. It offered proof of the strongest kind that when libelant returned to the ship at about 8:00 P.M. he was intoxicated to the point of being a nuisance. Some of this proof came from ship guards, but most of it from members of the longshore gang. I gathered the distinct impression after hearing the witnesses, that the longshoremen were telling nothing but the truth. It is quite understandable that each one of them would remember the incident, and libelant's condition, because all of them swore that he had been annoying them and interfering with their work, a thing which they would well remember. And, of course, this evidence in itself completely explains such an accident.

 Libelant was a business visitor. He had a right, as against the owner of the ship, to expect and to rely upon proper gear and safe passage to and from his work. But the burden was upon libelant to show that the gear was defective, or that the ship's people were otherwise negligent with respect to it. This burden he failed to sustain.

I am satisfied that Carter & Weekes Stevedoring Company was erroneously impleaded, as the result of an understandable mistake. That respondent is, therefore, entitled to a decree of dismissal, without costs. However, this disposition is, of course, without prejudice to whatever rights and liabilities exist between the shipowner and the stevedoring company which actually did the work (not a party here), in the event that the question should become more than moot because my findings are altered on review. I suppose this result would follow anyhow because I make no findings and draw no conclusions concerning the stevedore's liability vis a vis the owner. All that has been decided is that no fault has been proved with respect to the condition and use of the ship's gear, which leads to a decree on the merits with costs in favor of the owner.

I have filed findings of fact and conclusions of law. Submit decree.